**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KAMRAN AND COMPANY, LLC and KAMRAN CULINEX, LLC,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.** |
| **SEFA, LLC, KELLY CAIN, MARC ISRAEL, JAMIE ARGUELLO, JOHN DOE 1, JOHN DOE 2, and JOHN DOE 3,** | ) ) ) ) | **JURY DEMANDED** |
| **Defendants.** | ) ) | |

## COMPLAINT

Plaintiffs Kamran and Company, LLC and Kamran Culinex, LLC (together, "**Plaintiffs**") file this Complaint against SEFA, LLC ("**SEFA**"), Kelly Cain ("**Cain**"), Marc Israel ("**Israel**"), Jamie Arguello ("**Arguello**"), and other as-of-yet unknown members of SEFA's Board of Managers identified herein as John Doe 1, John Doe 2, and John Doe 3.

## INTRODUCTION

This action arises out of a brazen and bad-faith scheme to knock out and stifle competition. Defendant SEFA is one of the nation's leading food service group purchasing organizations, consisting of competing food service equipment dealers, manufacturers, and suppliers. Defendants Israel and Arguello are chief executives of two of SEFA's largest and most influential members, and they sit on SEFA's Board of Managers. Cain, acting on behalf of SEFA as its Chief Executive Officer, conspired with Israel, Arguello, and other unidentified members of the Board of Managers to oust Plaintiffs, who are market competitors and well-respected businesses in the food service industry. Motivated by greed and fear of the threat posed by successful and growing competitors, Israel, Arguello, and the Board of Managers agreed with Cain to expel Plaintiffs from SEFA,

1

thereby depriving Plaintiffs of the benefits of group purchasing and access to customers. In so doing, the Defendants conspired to illegally restrain lawful competition for talent, weaken Plaintiffs as competitors in the marketplace, damage Plaintiffs' reputation, disrupt Plaintiffs' businesses, and intentionally and publicly embarrass Plaintiffs among their competitors, customers, and those within the food service industry at large. The Defendants' actions are tortious and in flagrant contravention of antitrust laws.

By their written admission, the Board of Managers voted to terminate Plaintiffs' dealer memberships in SEFA on pretextual grounds, and they disparaged Plaintiffs to their competitors and contractual counterparties. Defendants acted not on the basis of any conduct which actually warranted termination, but instead as a reaction to the threat posed by Plaintiffs' successful growth in the market. Defendants' conduct amounts to an improper group boycott premised on a naked no-poach agreement amongst competitors that is *per se* unlawful under antitrust laws. The Defendants' blatant, unjustifiable collective action adversely impacts Plaintiffs' ability to compete and provide customers the best products and prices. Defendants' wrongful and illegal conduct caused Plaintiffs to suffer millions of dollars in losses, and the harm and damage to Plaintiffs continue to accrue.

In addition, SEFA and Cain also intentionally stole and converted for their own use and benefit more than $1.5M in funds rightfully owned by Plaintiffs. Those funds remain in SEFA's and Cain's possession as the date of this filing, thereby depriving Plaintiffs of their value.

Plaintiffs seek to recover all monetary damages to which they are entitled, along with any other relief that may be necessary to prevent Defendants from causing further harm to Plaintiffs.

## PARTIES

1.      Defendant SEFA, LLC is an Illinois limited liability company with its principal place of business at 20 N. Martingale Road, Suite 410, Schaumburg, IL 60173. SEFA's registered agent for service of process is Richmond A. Payne, 1515 E. Woodfield Road, Suite 230, Schaumburg, IL 60173-5431.

2.      Defendant Kelly Cain is the Chief Executive Officer of SEFA. On information and belief, Cain is a resident and citizen of Illinois.

3.      On information and belief, Defendant Marc Israel is a member of the Board of Managers of SEFA. On information and belief, Israel is a resident and citizen of Michigan.

4.      On information and belief, Defendant Jamie Arguello is a member of the Board of Managers of SEFA. On information and belief, Israel is a resident and citizen of Colorado.

5.      John Doe 1 is a member of the Board of Managers of SEFA, whose identity is not yet known.

6.      John Doe 2 is a member of the Board of Managers of SEFA, whose identity is not yet known.

7.      John Doe 3 is a member of the Board of Managers of SEFA, whose identity is not yet known.

8.      Plaintiff Kamran and Company, LLC ("**Kamran & Co.**") is a California limited liability company.

9.      Plaintiff Kamran Culinex, LLC ("**Kamran Culinex**") is a North Dakota limited liability company. Kamran & Co. and Kamran Culinex are two of several wholly owned subsidiaries of Kamran Buyer, LLC.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26 to award treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by virtue of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11.     This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because they are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy.

12.     This Court has personal jurisdiction because SEFA has its principal place of business in this District and because the Defendants collectively (a) transacted business throughout the United States, including this District; (b) have substantial contacts with the United States, including this District; and (c) are engaged in a conspiracy that is directed at, had, and continues to have a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District and the United States. Defendants also performed actions or consummated some transactions in this District and Plaintiffs' claims arise out of or result from Defendants' actions in this District.

13.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), and under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the action occurred in this District, and these unlawful acts caused harm to interstate commerce in this District.

## INTERSTATE COMMERCE

14.     Defendants' actions as set forth in this Complaint have substantially affected and are within the flow of interstate commerce. SEFA's members provide goods and services to customers who reside throughout the United States, and its group purchasing activities involve suppliers that reside throughout the country. Accordingly, Defendants' actions are within the flow of interstate commerce and were intended to have direct, substantial, and reasonably foreseeable effects on interstate commerce.

## FACTS

I.   **SEFA constitutes a "buying group" that restaurant industry competitors join for favorable pricing and other group benefits.**

15.     SEFA is a network of food service supply and equipment dealers and vendor partners in the restaurant industry.

16.     SEFA's Board of Managers, which includes Defendants Israel, Arguello, and other unidentified individuals (John Doe 1, John Doe 2, and John Doe 3) (collectively, the "**Co-Conspirator Board Members**") consists of representatives of companies that are SEFA's largest and most influential members.

17.     The Co-Conspirator Board Members run companies that compete amongst themselves and with SEFA's other members in the food service industry, including Plaintiffs.

18.     SEFA touts itself as an organization which "connect[s] food service equipment dealers with manufacturers to facilitate transactions that were convenient and profitable for both." SEFA calls itself "a buying group," and SEFA markets itself as "the most respected, most trusted and most successful buying group in the industry."[1]

---

[1] *See, e.g.,* https://www.sefa.com/about (last visited September 24, 2024).

19.     SEFA lures market participants to join its buying group by leveraging the power of "The SEFA Network." Through that network, SEFA claims that its "bargaining power, strength and reputation" increase member profitability.

20.     Companies like the Plaintiffs join SEFA as "dealer members" to obtain the benefit of SEFA's negotiated pricing between dealers on the one hand and manufacturers and suppliers on the other.

21.     SEFA creates member-only purchasing programs called "Program Agreements," which give dealers access to special pricing with SEFA's selected manufacturers and suppliers.

22.     In addition to favorable pricing, each Program Agreement contains terms as to quarterly and annual rebates and incentives the SEFA suppliers will pay to SEFA for the supplier's eligible sales to SEFA members.

23.     By way of example:

a.  SEFA dealer members purchase supplies and equipment from participating manufacturers and suppliers. Those manufacturers and suppliers offer discounts to the dealers according to the Program Agreement with SEFA.

b.  The manufacturers and suppliers also pay rebates associated with the dealer's purchases directly to SEFA rather than to the dealer members themselves.

c.  After collecting and reconciling those rebate funds, SEFA pays them to the appropriate SEFA dealer members.

24.     In essence, SEFA's rebate service centralizes the processing and fulfillment of rebates that its members would otherwise handle themselves, thereby making SEFA a conduit through which an enormous amount of member-owed money flows.

25.     SEFA, as a leading food service equipment and supplies group purchasing organization, is critical to its members' competition for customers.

26.     SEFA's programs facilitate and promote competition in the marketplace by providing its members with the ability to provide products and services to their respective customers at competitive prices.

27.     Without SEFA membership, a competitor is at a disadvantage because it is denied access to the discounts and rebates that allow a company to provide more competitive pricing for products and services to customers.

**II.     SEFA is obligated to follow the policies and procedures it requires its dealer members to acknowledge.**

28.     Until they were pretextually terminated on April 27, 2024, Plaintiffs were "dealer members" of SEFA entitled to all the rights and benefits of membership.

29.     SEFA requires its dealer members to acknowledge its policies and procedures as a prerequisite to qualify for incentives and participate in its programs. A copy of the most recent iteration of SEFA's policies and procedures (the "**Policies and Procedures**") is attached as **Exhibit 1**.

30.     SEFA is contractually bound by the terms of its Policies and Procedures.

31.     In Section 26 of the "Membership Requirements," SEFA set forth how it would handle certain claimed "violations" of members' duties.

32.     The Policies and Procedures explicitly state that, "[i]f SEFA determines a Member has violated this section, SEFA will provide that Member written notice providing the factual basis for this determination and give the Member at least ten (10) business days to respond to alleged violation before any penalty is applied." Ex. 1 at ¶ 26.

33. Section 26 of the Policies and Procedures requires SEFA to give a member notice and an opportunity to respond before taking any action that could punish or damage a member, including of course the termination of membership in SEFA.

34. In other words, the Policies and Procedures contain due process requirements that SEFA must follow.

## III. Plaintiffs are respected businesses with decades of established success in the food service industry.

35. Kamran & Co. is a leading provider of food service equipment solutions with decades of design and construction experience in a wide range of industries.

36. Established in California in 1988, Kamran & Co. has completed over 1,000 projects totaling over $1 billion in construction value across a diverse set of end markets, including some of the world's most complex food service jobs.

37. Kamran & Co.'s customer base includes dozens of companies and organizations that are household names worldwide.

38. In 2022, Kamran & Co. joined SEFA as a dealer member.

39. In 2023, Kamran & Co.'s parent company, Kamran Buyer LLC, acquired Culinex—a full service, commercial kitchen supply and design company based in Fargo, ND.

40. After the acquisition, Culinex was renamed Kamran Culinex.

41. Kamran Culinex has operated continuously for over 75 years and is a leading distributor and seller of commercial food service equipment, smallware, furniture, and custom fabricated goods. Kamran Culinex also offers commercial kitchen consulting and design services.

42. At the time of the acquisition, Kamran Culinex had been a SEFA dealer member for several years, and its President, Mark Howes ("**Howes**"), was well known throughout SEFA and in the food service industry as a whole.

43.     Although Kamran & Co. and Kamran Culinex enjoyed enormous success for many years, they were both relative newcomers to SEFA.

44.     On information and belief, the acquisition and eventual affiliation of the two companies was a major point of concern for their competitors within SEFA, including the companies which Israel, Arguello, and the other Co-Conspirator Board Members owned and controlled. Plaintiffs' growth, market share, and financial success represented a threat to their businesses.

45.     Not only did Plaintiffs actively compete with the companies run by Israel, Arguello, and the other Co-Conspirator Board Members for business and contracts, they also competed for talent.

46.     On information and belief, Cain and SEFA knew that Israel, Arguello, and other Board of Manager members resented Plaintiffs' strategic growth and the increased strength in their position to compete for customers and talent.

47.     On information and belief, Cain and SEFA also knew that those same Board of Managers members believed Plaintiffs represented serious competitive threats to their businesses.

**IV.     SEFA, Cain and the Co-Conspirator Board Members concocted and executed on their scheme to pretextually terminate Plaintiffs' membership in SEFA.**

48.     Because Plaintiffs posed a threat to the influential Board of Managers' companies, SEFA, Cain and the Co-Conspirator Board Members agreed in or about March to April of 2024 to pretextually terminate Plaintiffs' membership in SEFA and damage their reputation in the industry to thwart their rising success.

49.     SEFA held its 38th Annual Partnership Conference (the "**Conference**") at the Broadmoor Resort in Colorado Springs, Colorado from April 28 through May 2, 2024.

50. According to SEFA, the Conference was a "premier event" that "brought together SEFA's leading dealers and suppliers to recognize their remarkable achievements and foster industry collaboration."

51. SEFA invited Plaintiffs to attend the Conference. Howes and several other employees, including Jeff Gilliland ("**Gilliland**") and Vincent Sanchez ("**Sanchez**"), attended as Plaintiffs' representatives.

52. Unbeknownst to Plaintiffs, SEFA, Cain, and the Co-Conspirator Board Members, including Defendants Israel and Arguello, planned to use the Conference as an opportunity to effectuate their conspiracy to execute an unlawful group boycott of Plaintiffs, damage Plaintiffs' reputations, disrupt their businesses, and intentionally and publicly embarrass them among competitors and within the industry at large.

53. Accordingly, SEFA, Cain, Israel and Arguello and the Co-Conspirator Board Members met in person on April 27, 2024 and agreed to terminate Plaintiffs from SEFA and to publicly expel their representatives from the Conference's welcome reception, which SEFA hosted for the attendees.

54. Howes and the other representatives were completely unaware of these clandestine dealings.

55. Not knowing that they were walking into a trap, Howes, Gilliland, and Sanchez attended the reception along with many other SEFA member representatives—including Plaintiffs' competitors.

56. After the reception was underway and in the presence of many other SEFA member representatives, Cain approached Howes and asked to speak to him. Cain then pulled Howes out of the reception and into an empty banquet room, where Israel was present.

57.     Israel is the President of one of SEFA's largest and most influential members, Great Lakes Hotel Supply Co. ("**Great Lakes**"). Plaintiffs are one of Great Lakes' competitors.

58.     Israel and Cain orally informed Howes that Plaintiffs' membership in SEFA was terminated, effective immediately. Without providing any specifics, Cain and Israel stated generally that Plaintiffs had violated SEFA's "bylaws" by "soliciting" or attempting to "poach" employees of another SEFA member.

59.     According to Israel and Cain, Plaintiffs were prohibited from hiring employees from their competitors within SEFA.

60.     However, there are no such SEFA "bylaws," nor are there any written policies relating to "soliciting" or "poaching."

61.     The best Cain and Israel could conjure was that the purported "poaching" had occurred during SEFA's National Sales Conference ("**NSC**"), which was held March 5-8, 2024, in Rosemont, Illinois.

62.     Even though the alleged "poaching" was said to have occurred more than a month and a half earlier, the conversation with Cain and Israel was the first that Howes or anyone affiliated with Plaintiffs had heard of any purported poaching.

63.     SEFA's accusations and its immediate termination of Plaintiffs came as a complete shock to Howes.

64.     SEFA's Policies and Procedures explicitly provide for notice and an opportunity to be heard, but nobody from SEFA—including Cain—provided any notice to Plaintiffs of this purported poaching incident, nobody provided any warning to Plaintiffs that any actions were under investigation, and nobody notified Plaintiffs that any potential punishment was being considered.

65.     Instead, Cain claimed that SEFA's leaders met earlier that day—April 27—to discuss the "violation" and voted on the spot to terminate Plaintiffs from SEFA effective immediately.

66.     Howes asked Cain and Israel to reconsider and to provide specific facts so that Plaintiffs could adequately investigate the situation and respond accordingly. But Cain, Israel, and the other Co-Conspirator Board Members already had agreed and decided to expel Plaintiffs, and Cain and Israel provided no further information.

67.     Afterwards, when Howes began to walk back to the reception, Cain stopped Howes and told him he could not reenter.

68.     When Howes objected and told Cain that his employees, Gilliland and Sanchez, were still in the reception, Cain said she would retrieve them. In front of all of the other attendees, Cain visibly escorted Gilliland and Sanchez out of the reception.

69.     The next morning, Cain and Israel met with Howes again and reiterated that Plaintiffs were "out" of SEFA, effective immediately.

70.     Again, Howes pressed for information and told them it was a mistake.

71.     Cain responded: "You don't want to play this out in the public opinion."

72.     Cain informed Howes in no uncertain terms that he and all other representatives of the Plaintiffs were not permitted or welcome to attend the Conference, and she demanded they leave the grounds of the hotel.

73.     Plaintiffs obliged, cancelled their hotel rooms for all attendees, altered flight plans, and turned around or sent all employees and representatives home that day.

**V.** **SEFA, Cain, and the Co-Conspirator Board Members publicly notified others that SEFA had terminated Plaintiffs' membership.**

74. Immediately after the meeting with Howes and over the next several days while the Conference was ongoing, Cain, the Co-Conspirator Board Members, and others acting for, at the direction of, or on behalf of SEFA informed Conference attendees that Plaintiffs' membership had been terminated and that Plaintiffs had been kicked out of the Conference.

75. On information and belief, Cain, the Co-Conspirator Board Members, and others acting for, at the direction of, or on behalf of SEFA, informed SEFA members, suppliers, and manufacturers in "The SEFA Network" and within the restaurant and food service industry at large that Plaintiffs had been terminated as SEFA members.

76. On information and belief, Cain, the Co-Conspirator Board Members, and others acting for, at the direction of, or on behalf of SEFA, told other third parties that Plaintiffs had violated its policies and that their wrongful actions justified immediate termination from SEFA.

77. The fact that Howes and all other representative for Plaintiffs had been barred from and kicked out of the Conference on its opening night was regarded as a scandal throughout SEFA. Their termination from the organization remained a point of open conversation and discussion during and after the Conference.

78. The Defendants' actions were conspicuous and cast a pall over Plaintiffs, their businesses, and their employees.

79. SEFA, Cain, and the Co-Conspirator Board Members intended for SEFA members and vendor partners to believe, assume, or conclude that Plaintiffs had done something horribly wrong if not outright illegal, thereby justifying their immediate and dramatic expulsion from SEFA and the Conference.

80.     SEFA, Cain, and the Co-Conspirator Board Members took those actions in furtherance of their conspiracy to expel Plaintiffs, effect a group boycott against Plaintiffs, publicly embarrass Plaintiffs, and disrupt Plaintiffs' business contracts and opportunities. On information and belief, this scheme was driven by the Co-Conspirator Board Member's influence over SEFA and their intention of eliminating the threat that Plaintiffs' growth and success posed to their respective businesses, including the competition for talent.

81.     The Defendants' actions had their intended effect. Immediately upon returning from the Conference, Plaintiffs' employees and executives received a barrage of communications from SEFA members, suppliers, manufacturers, and other customers, potential customers, contractual counterparties and potential contractual counterparties in the restaurant and food service industry who had heard or were told directly by SEFA, Cain and/or the Co-Conspirator Board Members that SEFA had terminated Plaintiffs' membership and expelled them from the Conference.

82.     On information and belief, SEFA also directed suppliers and manufacturers in "The SEFA Network" to not offer discount pricing or rebates to Plaintiffs on the same terms as SEFA members.

83.     The intended purposes of the Defendants' actions were to raise Plaintiffs' operating costs, ostracize Plaintiffs in the industry, cause suppliers and manufacturers not to negotiate new purchasing contracts with Plaintiffs, and prevent Plaintiffs from obtaining discounts or other deals that would keep it competitive in the industry.

84.     In addition to the reputational harm and overnight dramatic increase in expenses, Plaintiffs were forced to reconcile all of their own rebates—a process that is costly, time consuming, and labor intensive.

85. Because Plaintiffs had relied on SEFA for rebate processing for years, they did not have employees on staff that were trained and ready to handle the large volume of rebates associated with their purchasing volume on a going forward basis.

86. Despite the immediate and material consequences of the Defendants' actions, Plaintiffs still had no clarity as to the factual predicate for their abrupt and immediate expulsion.

87. As a result, on May 1, 2024, Plaintiffs through counsel sent a letter to SEFA and, among other things, demanded that SEFA explain the basis for its actions and return Plaintiffs to their status as members. Plaintiffs also requested any documents that supported SEFA's actions, including any information and documents SEFA relied upon and the minutes of the Board meeting where SEFA and the Co-Conspirator Board Members purportedly voted to terminate Plaintiffs.

88. Meanwhile, SEFA sent a letter to Plaintiffs dated May 1, 2024, (the "**May 1 Letter**").

89. The May 1 Letter claimed: "SEFA has reviewed a reported incident of a [Kamran] team member's activities involving the recruitment of employees of several other SEFA members at the SEFA-hosted March 2024 National Sales Conference as well as other conferences."

90. According to SEFA, "the incidents"—plural—"have been determined to be a conduct violation of SEFA's 2024 Membership Requirements, as agreed to by [Kamran] on December 7, 2023."

91. The May 1 Letter quoted from and relied on Section 26 of SEFA's 2024 Policies and Procedures and Paragraph 2.4 of the operating agreement, both of which SEFA wrongly claimed were the source of the alleged prohibition on "poaching" or "recruitment" as alleged.

92. There is nothing in SEFA's Policies and Procedures or any of its other governing documents which supports any supposed prohibition on "poaching" or "recruitment."

93.     Though the May 1 Letter states that Plaintiffs' alleged actions "*may* result in a termination," that Plaintiffs that had "ten (10) business days to respond to the allegations," and that the "potential penalty" could result in termination and expulsion, Cain, Israel, Arguello, and the Co-Conspirator Board Members already had voted on and effected Plaintiffs' termination at the Conference.

94.     Cain and Israel had explicitly told Howes on April 27 and April 28 that SEFA and the Co-Conspirator Board Members already had voted Plaintiffs out.

95.     Because the May 1 Letter included multiple material misstatements and included vague references to multiple incidents of poaching with absolutely no detail, Plaintiffs asked for clarification in writing about the underlying factual predicates for SEFA's, Cain's and the Co-Conspirator Board Members' extreme conduct.

96.     Plaintiffs also asked for clarification about whether they had been terminated.

97.     During subsequent discussions, SEFA, through its attorneys, acknowledged the May 1 Letter lacked sufficient detail. SEFA's attorneys promised to provide more information.

98.     On May 6, 2024, SEFA's attorney sent a second letter (the "**May 6 Letter**").

99.     Despite the fact that only three business days had transpired since SEFA sent the May 1 Letter and notified Plaintiffs they had ten business days to respond, the May 6 Letter confirmed that Plaintiffs' membership in SEFA was in fact terminated effective April 27, 2024.

100.    The May 6 Letter vitiated the 10-day response period and any opportunity for Plaintiffs to substantively address the situation.

101.    The May 6 Letter declared, "there is no point in a 10-day cure period," and "SEFA will not consider reinstating Kamran as a member of SEFA."

102.    The May 6 Letter claimed that SEFA's decision to expel Plaintiffs was based on Gilliland's alleged solicitation during NSC of Eric Landauer ("**Landauer**")—an employee from another SEFA member, Grady's Restaurant and Bar Supply ("**Grady's**").

103.    SEFA asserted that the purported solicitation occurred during a "Welcome Dinner" hosted by a SEFA vendor, Continental Refrigeration, on the first night of NSC.

104.    The May 6 Letter claimed that Landauer reported the "solicitation" to Grady's Chief Executive Officer, Defendant Arguello, the night that it supposedly occurred—March 5, 2024.

105.    Grady's is a competitor of Plaintiffs and one of the largest influential members of SEFA. On information and belief, Defendant Arguello is on the Board of Managers and is influential within SEFA.

106.    The allegations regarding Gilliland's conduct in the May 6 Letter are unequivocally false. Gilliland did not attempt to solicit or hire Landauer during NSC or at any time since.

107.    According to SEFA, when Arguello raised the issue with SEFA's Board of Managers, the Co-Conspirator Board Members "voted to terminate Kamran's membership in SEFA, "effective immediately" on April 27, 2024.

108.    The reason provided for Kamran's termination was a pretext.

109.    Cain and the Co-Conspirator Board Members did not meet directly with Landauer or any other supposed witness as part of its "investigation" before voting to terminate Plaintiffs.

110.    On information and belief, there was no investigation.

111.    There was no notice to Plaintiffs or any communication about the purported incident in the six weeks between NSC and the Conference. At best, the Defendants acted on

secondhand hearsay delivered to SEFA and the Co-Conspirator Board Members by Defendant Arguello, an influential CEO of one of Plaintiffs' competitors.

112. On information and belief, SEFA terminated Plaintiffs without an investigation, without adequate notice, and without an opportunity to be heard because the CEO of one of its largest and most influential members, Grady's, and other influential CEOs, including Israel, pressured SEFA, Cain, and the Co-Conspirator Board Members to do so.

113. Indeed, in the six weeks that passed between NSC and the April 27 termination, nobody from Plaintiffs contacted Landauer, interviewed Landauer, hired Landauer, or even considered him for any employment of any kind whatsoever. On information and belief, to date, Landauer remains employed by Grady's.

114. The May 6 Letter offered no specifics about any other violations, despite SEFA having claimed in the May 1 Letter that it had evidence of multiple supposed "poaching" incidents.

115. The May 6 Letter also did not offer any detail as to how SEFA carried out its supposed "investigation" during the course of one meeting. That is because there was none.

116. At most, the May 6 Letter confirmed what Plaintiffs already knew—that SEFA was notifying suppliers that SEFA had expelled Plaintiffs as members and that they were barred from offering Plaintiffs the same rebates and discounts.

## VI. SEFA, Cain, and the Co-Conspirator Board Members enforced a *per se* unlawful naked no-poach agreement policy against Plaintiffs.

117. According to SEFA's multiple written explanations, the sole basis for Plaintiffs' termination from SEFA was the purported violation of an employee no-poach agreement, not any specific provision found in its governing documents.

118. On information and belief, this policy was adopted by SEFA, Cain, and the Co-Conspirator Board Members and was enforced solely against Plaintiffs.

119.    This policy is not ancillary to any legitimate or lawful business reason and is void and unenforceable against Plaintiffs as it is contrary to public policy.

120.    It is axiomatic that a naked no-poach agreement amongst competitors is an improper form of market allocation that is *per se* unlawful under the antitrust laws. The enforcement of this policy against Plaintiffs violates at its core the basic and fundamental principles of the antitrust laws.

121.    Even if Plaintiffs did attempt to unilaterally recruit a competitor's employee during the welcome dinner at NSC (they did not), such recruitment would be wholly lawful and consistent with the free flow of labor and competition for labor talent.

## VII.    SEFA, Cain, and the Co-Conspirator Board Members improperly expelled and terminated Plaintiffs.

122.    Putting aside the illegality of their illegal no-poach agreement, the Defendants' concocted reasoning was nonetheless a pretext to improperly expel Plaintiffs.

123.    The Defendants' termination and exclusion of Plaintiffs, without any factual or legal basis, was tantamount to an illegal group boycott at the behest of Plaintiffs' competitors: the companies which SEFA's Co-Conspirator Board Members represent.

124.    The complete abandonment by SEFA of its own due process standards that members are afforded in decisions—undoubtedly the most extreme decision relating to expulsion—further casts doubt on the veracity of SEFA's claimed basis for its actions against Plaintiffs.

125.    The facts set forth in this Complaint are so heinous that they warrant *per se* application to the conduct. Alternatively, the conduct would nonetheless be illegal under a "quick look" or Rule of Reason standard.

126. By excluding Plaintiffs from SEFA, Plaintiffs were denied access to the programs, discounts, and rebates they would otherwise be entitled to as members of the organization. These benefits allowed Plaintiffs to compete against other members in the industry, which also benefits customers. Moreover, the elimination of Plaintiffs from SEFA reduces customer choice and options, thereby harming competition.

## VIII. Relevant market.

127. Defendants' conduct to suppress competition for labor talent and to eliminate Plaintiffs from SEFA are so offensive that it warrants *per se* treatment as a matter of law such that a relevant market inquiry is not required.

128. To the extent that a "quick look" or Rule of Reason treatment is applied to analyze the conduct, there are two relevant markets that have been adversely impacted.

129. First, the relevant product market is commercial kitchen food service equipment solutions for customers in the United States, which is the relevant geographic market. Within this relevant product market, there are submarkets for commercial kitchen smallware supply, furniture supply, custom fabricated goods supply, consulting, construction, and design services (the "**Commercial Kitchen Food Service Equipment Solutions Market**"), many of which have been impacted by Defendants' conduct.

130. As SEFA admits, its network connects suppliers of commercial kitchen food service equipment with dealers, such as the Co-Conspirator Board Members, Plaintiffs, and other members, to facilitate a group purchasing network that provides members better pricing and services.

131.     Plaintiffs and other SEFA members, including the Co-Conspirator Board Members, then utilize the products and services from the SEFA network programs to compete in the Commercial Kitchen Food Service Equipment Solutions Market for customers.

132.     As SEFA states on its website, its group purchasing organization is an industry leading food service buying group. It is a business necessity that participants in the Commercial Kitchen Food Service Equipment Solutions Market be a member of a buying group, and it was a business necessity for Plaintiffs to be a member of SEFA in order to gain access and benefit from network of commercial food service equipment suppliers in SEFA's network.

133.     Plaintiffs' illegal expulsion from SEFA and SEFA's subsequent market communications and conduct, as set forth in this Complaint, resulted in Plaintiffs being unable to mitigate the harm by immediately joining an alternative buying group that provides the same range of benefits as SEFA.

134.     SEFA's efforts to prevent Plaintiffs from gaining access to suppliers did not end there. On information and belief, SEFA instructed suppliers in its network that they could not provide comparable pricing and rebates to non-SEFA members—meaning that Plaintiffs was precluded from negotiating its own favorable pricing with SEFA suppliers outside of the buying group.

135.     As a result of this conduct, Plaintiffs were effectively cut off from competitive pricing for products and services within the Commercial Kitchen Food Service Equipment Solutions Market, and customers now have diminished choices for products and services.

136.     In addition, SEFA, Cain and its Co-Conspirator Board Members' illegal market allocation, via its apparent no-poach policy, adversely impacts a second relevant product market: the labor talent market for executives, managers, and/or employees in the United States (the

relevant geographic market) with experience in commercial kitchen food service equipment solutions (the **"Commercial Kitchen Food Service Equipment Solutions Labor Talent Market"**).

137. The competition for individuals in the Commercial Kitchen Food Service Equipment Solutions Labor Talent Market is intense, as companies are seeking the best talent in this specialized industry to improve offerings and services to customers.

138. There are no comparable substitutes for the type of labor talent companies like Plaintiffs and their competitors within the SEFA network seek due to the specialized industry needs and demands.

139. Plaintiffs' illegal expulsion from SEFA and SEFA's subsequent market communications and conduct, as set forth in this Complaint, have harmed Plaintiffs' ability to effectively compete and hire individuals in the Commercial Kitchen Food Service Equipment Solutions Labor Talent Market.

**IX.     SEFA breached its obligations to Plaintiffs.**

140. SEFA's termination of Plaintiffs constituted a breach and repudiation of its obligations under the Policies and Procedures.

141. According to SEFA's multiple written explanations, the sole basis for Plaintiffs' termination from SEFA was the alleged violation of an employee no-poach agreement, not any specific provision found in its governing documents.

142. The Defendants' elimination and exclusion of Plaintiffs from its "buying group" without any factual or legal basis was tantamount to an illegal group boycott.

143.    Plaintiffs' competitors have leveraged the Defendants' actions to interfere with deals Plaintiffs already signed or closed with clients by asserting that Plaintiffs will no longer be competitive from a pricing perspective due to their purported termination from SEFA.

144.    To turn this prediction into a reality, SEFA and Cain instructed vendors that they could not provide comparable pricing and rebates to non-SEFA members—an immediate material harm to Plaintiffs.

145.    Further, the allegation and insinuation that Plaintiffs engaged in some form of misconduct or underhanded business practice damaged, and continues to damage, their standing in the industry.

146.    The Defendants' public actions and statements reflect significant tortious and malicious conduct taken against Plaintiffs in a coordinated and unlawful attempt to damage Plaintiffs' reputation and market position within the industry.

147.    Further, the Defendants' statements to customers and industry peers about Plaintiffs' termination were in direct violation of SEFA's Policies and Procedures.

## VI.    SEFA and Cain seized, withheld, and converted rebate funds rightfully belonging to Plaintiffs.

148.    The Defendants' anti-competitive behavior was not limited to icing out Plaintiffs within the food service industry.

149.    SEFA and Cain also seized, withheld, and converted funds which were rightfully owed to Plaintiffs.

150.    Specifically, as of April 27, 2024, Plaintiffs were owed approximately $1.5M in rebate payments from SEFA, which represented the processed rebate value they were due under SEFA's Program Agreement for the first four months of 2024.

151.    SEFA refused to process those rebates—even those which predated the supposed termination by multiple months.

152.    Incredibly, SEFA withheld the rebates because of Plaintiffs' alleged "violation" of nonexistent policies based entirely on false and misleading hearsay for which SEFA provided no notice.

153.    SEFA's actions immediately and irreparably injured Plaintiffs' business relationships and reputation with its competitors, customers, manufacturers, suppliers, and employees.

154.    SEFA's actions caused significant damage to Plaintiffs, including lost profits, business interruption, loss of business opportunities, and the general destabilization of their operations.

155.    SEFA set in motion a cascading series of damaging consequences directly and proximately resulting from its breach of contractual, statutory, and common law obligations.

156.    The financial fallout from SEFA's conduct is continuing to accrue, and the damages to Plaintiffs total in the millions of dollars.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 1 of the Sherman Act: *Per Se* Illegal Naked No-Poach Agreement and Enforcement of Policy Against Members
### (Against SEFA, Cain, and the Co-Conspirator Board Members)

157.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

158.    SEFA, Cain, and the Co-Conspirator Board Members entered into a contract, conspiracy, and agreement to restrain trade unreasonably and illegally by entering into a naked no-poach agreement and policy.

159.    Plaintiffs are not a party to this agreement. Moreover, Plaintiffs would never agree to such an agreement or policy that is clearly violative of the antitrust laws.

160.    The existence of such an agreement and policy is an impermissible form of market allocation that is *per se* illegal.

161.    The enforcement of this no-poach agreement policy by the Defendants upon unsuspecting members is equally devoid of any legitimate reason and warrants *per se* treatment.

162.    Plaintiffs have antitrust standing to pursue this claim. Moreover, Plaintiffs are best positioned to bring this action to preserve competition for the recruitment and hiring of labor talent such as executives, managers, and/or employees with experience in the commercial kitchen food service equipment solutions industry.

163.    The harm to Plaintiffs was the direct result of and was directly caused by the Defendants' anticompetitive conduct and enforcement of this illegal policy.

164.    The harm to Plaintiffs is the type of injury that Congress sought to redress with the antitrust laws.

165.    The damages to Plaintiffs are not speculative. Plaintiffs are no longer able to participate in SEFA and have been harmed as set forth in this Complaint. There is no risk of Plaintiffs receiving a duplicative recovery.

### COUNT II
### Violations of Section 1 of the Sherman Act: Agreement to Restrain Competition
### *Per Se* Illegal Group Boycott
### (Against SEFA, Cain, and the Co-Conspirator Board Members)

166.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

167.    The actions of SEFA, Cain, and the Co-Conspirator Board Members alleged above were joint efforts to disadvantage competitors—Plaintiffs—by either directly denying or

persuading or coercing suppliers or customers to deny relationships Plaintiffs need in the competitive struggle.

168.    SEFA, by its own admission, is the industry's leading food service buying, marketing, and training group such that it possesses a dominant position in the relevant market.

169.    SEFA, Cain, and the Co-Conspirator Board Members possess market power or unique access to a business element necessary for effective competition. Specifically, the Defendants control access to the SEFA Network and all of the programmatic benefits members receive that allow for effective competition.

170.    SEFA, Cain, and the Co-Conspirator Board Members cut off Plaintiffs' access to a supply, facility, or market necessary to enable Plaintiffs to compete. Specifically, SEFA and Co-Conspirator Board Members cut off Plaintiffs' access to all SEFA programs, discounts, and rebates that allowed Plaintiffs to compete with other members for customers.

171.    SEFA, Cain, and the Co-Conspirator Board Members organized and implemented a *per se* illegal group boycott of Plaintiffs, which continues to this day.

172.    Plaintiffs have antitrust standing to pursue this claim. Moreover, Plaintiffs are best positioned to bring this action to preserve competition.

173.    The harm to Plaintiffs was the direct result of and was directly caused by the Defendants' anticompetitive conduct.

174.    The harm to Plaintiffs is the type of injury that Congress sought to redress with the antitrust laws.

175.    The damages to Plaintiffs are not speculative. Plaintiffs are no longer able to participate in SEFA and have been harmed as set forth in this Complaint. There is no risk of Plaintiffs receiving a duplicative recovery.

**COUNT III**
**Violation of Section 1 of the Sherman Act: Agreement to Restrain Competition**
**Quick Look or Rule of Reason**
**(Against SEFA, Cain, and the Co-Conspirator Board Members)**

176.     Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

177.     SEFA, Cain, and the Co-Conspirator Board Members entered into a contract, conspiracy, and agreement to restrain trade unreasonably and illegally by expelling Plaintiffs as dealer members of SEFA.

178.     SEFA, Cain, and the Co-Conspirator Board Members' actions are an unreasonable restraint by taking unprecedented disciplinary measures against Plaintiffs that fully prevent Plaintiffs from continuing to access the benefits from the organization, all of which, in turn, harm competition. Plaintiffs are improperly disadvantaged from competing in the Commercial Kitchen Food Service Equipment Solutions Market, and the Defendants' actions deprive customers of choices for products and services within the market.

179.     In addition, SEFA, Cain, and the Co-Conspirator Board Members' actions against Plaintiffs harm their ability to effectively compete to hire individuals in the Commercial Kitchen Food Service Equipment Solutions Labor Talent Market, thereby suppressing the free flow of labor and competition for labor talent.

180.     The Defendants' conduct has a general connection with and a substantial effect on interstate or foreign commerce. Their conduct also disrupts Plaintiffs' businesses and damages their ability to provide competitive products and services to customers.

181.     The anticompetitive effect of the Defendants' conduct is easily ascertained and can be observed with even a rudimentary understanding of economics. SEFA, Cain, and the Co-Conspirator Board Members removed Plaintiffs as members of the organization. By denying access to the leading group purchasing organization in the Commercial Kitchen Food Service

Equipment Solutions Market, customers are harmed by having fewer competitive choices for products and services.

182.    Similarly, because of Defendants' conduct to restrain competition for labor talent, Plaintiffs cannot effectively compete for said talent, which in turn restricts labor talent mobility in addition to suppressing wages and compensation for individuals seeking employment in the Commercial Kitchen Food Service Equipment Solutions Labor Talent Market.

183.    Accordingly, a truncated rule of reason analysis, or a "quick look," is appropriate, and Plaintiffs are not required to establish every aspect of the anticompetitive effect of SEFA's conduct or the market power of SEFA, Cain, and the Co-Conspirator Board Members.  Rather the burden is upon the Defendants to demonstrate any procompetitive justifications for its conspiracy to expel Plaintiffs.

184.    Even if a quick look analysis is not used, and a full Rule of Reason analysis is undertaken, the result is the same—SEFA conspired with Cain and its board members—Plaintiffs' competitors—to unreasonably restrain trade by eliminating Plaintiffs from the organization.

185.    The anticompetitive effect of SEFA's conduct is not outweighed by any procompetitive result or efficiencies that are generally afforded to group purchasing organizations. To wit, the actions of the Defendants are not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. The likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

186.    SEFA, Cain, and the Co-Conspirator Board Members acted with an improper motive in eliminating Plaintiffs from the organization for no express or legitimate reason set forth in SEFA's organizational documents. Moreover, even if one were to accept the Defendants' pretext

for Plaintiffs' expulsion—the purported recruitment of another member's employee—Plaintiffs' alleged conduct amounts to nothing more than lawful competition for talent.

187.    Plaintiffs have antitrust standing to pursue this claim. Moreover, Plaintiffs are best positioned to bring this action to preserve competition in the relevant market.

188.    The harm to Plaintiffs was the direct result of and was directly caused by SEFA's anticompetitive conduct.

189.    The harm to Plaintiffs is the type of injury that Congress sought to redress with the antitrust laws.

190.    The damages to Plaintiffs are not speculative.  Plaintiffs are no longer able to participate in SEFA and have been harmed as set forth in this Complaint.  There is no risk of Plaintiffs receiving a duplicative recovery.

**COUNT IV**
**Violations of the Illinois Antitrust Act, 740 ILCS 10**
**(Against SEFA, Cain, and the Co-Conspirator Board Members)**

191.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

192.    SEFA, Cain, and the Co-Conspirator Board Members entered into a contract, conspiracy, and agreement to restrain trade unreasonably and illegally by entering into a naked no-poach agreement and policy.

193.    Plaintiffs are not a party to this agreement. Moreover, Plaintiffs would never agree to such an agreement or policy that is clearly violative of the antitrust laws.

194.    The existence of such an agreement and policy is an impermissible form of market allocation that is *per se* illegal.

195.    The enforcement of this no-poach agreement policy by the Defendants upon unsuspecting members is equally devoid of any legitimate reason and warrants *per se* treatment.

196. The existence of such an agreement and policy is *per se* illegal under the Illinois Antitrust Act.

197. The actions of SEFA, Cain, and the Co-Conspirator Board Members alleged above also were joint efforts by to disadvantage competitors—Plaintiffs—by either directly denying or persuading or coercing suppliers or customers to deny relationships Plaintiffs need in the competitive struggle.

198. SEFA, by its own admission, is the industry's leading food service buying, marketing, and training group such that it possesses a dominant position in the relevant market.

199. SEFA, Cain, and the Co-Conspirator Board Members possess market power or unique access to a business element necessary for effective competition. Specifically, the Defendants control access to the SEFA Network and all of the programmatic benefits members receive that allow for effective competition.

200. SEFA, Cain, and the Co-Conspirator Board Members cut off Plaintiffs' access to a supply, facility, or market necessary to enable Plaintiffs to compete. Specifically, SEFA and Co-Conspirator Board Members cut off Plaintiffs' access to all SEFA programs, discounts, and rebates that allowed Plaintiffs to compete with other members for customers.

201. SEFA, Cain, and the Co-Conspirator Board Members organized and implemented a *per se* illegal group boycott of Plaintiffs, which continues to this day.

202. Alternatively, SEFA, Cain, and the Co-Conspirator Board Members' actions are an unreasonable restraint by taking unprecedented disciplinary measures against Plaintiffs that fully prevent Plaintiffs from continuing to access the benefits from the organization, all of which have, in turn, harm competition. Plaintiffs are improperly disadvantaged from competing in the

Commercial Kitchen Food Service Equipment Solutions Market, and the Defendants' actions deprive customers of choices for products and services within the market.

203.    The anticompetitive effect of the Defendants' conduct is easily ascertained and can be observed with even a rudimentary understanding of economics. SEFA, Cain, and the Co-Conspirator Board Members removed Plaintiffs as a member of the organization. By denying access to the leading group purchasing organization in the Commercial Kitchen Food Service Equipment Solutions Market, customers are harmed by having fewer competitive choices for products and services.

204.    Similarly, Defendants' conduct to restrain competition for labor talent, Plaintiffs cannot effectively compete for said talent, which in turn restricts labor talent mobility in addition to suppressing wages and compensation for individuals seeking employment in the Commercial Kitchen Food Service Equipment Solutions Labor Talent Market.

205.    The anticompetitive effect of SEFA's conduct is not outweighed by any procompetitive result or efficiencies that are generally afforded to group purchasing organizations. To wit, the actions of the Defendants were not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. The likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

206.    SEFA, Cain, and the Co-Conspirator Board Members acted with an improper motive in eliminating Plaintiffs from the organization for no express or legitimate reason set forth in SEFA's organizational documents. Moreover, even if one were to accept the Defendants' pretext for Plaintiffs' expulsion—the purported recruitment of another member's employee—Plaintiffs' alleged conduct amounted to nothing more than lawful competition for talent.

207. The damages to Plaintiffs are not speculative. Plaintiffs are no longer able to participate SEFA and have been harmed as set forth in this Complaint.

## COUNT V
## Conversion
## (Against SEFA and Cain)

208. Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

209. Plaintiffs are, and at all relevant times were, the lawful owner of rebates totaling approximately $1.5M, which amount remains in SEFA's or Cain's bank accounts or is otherwise under their control.

210. SEFA and Cain misappropriated the funds by wrongfully exerting dominion over them to the exclusion of Plaintiffs.

211. SEFA's and Cain's misappropriation of rebate funds was in defiance of Plaintiffs' rights.

212. SEFA and Cain stole and converted Plaintiffs' funds.

213. In committing the acts described herein, SEFA and Cain acted maliciously, intentionally, fraudulently and/or recklessly. Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be determined by the Court.

214. As a result of the conversion, Plaintiffs have been harmed in an amount to be proven at trial.

## COUNT VI
## Tortious Interference with Contract
## (Against SEFA, Cain, and the Co-Conspirator Board Members)

215. Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

216. Plaintiffs had valid and enforceable contractual relationships with their suppliers.

217.     SEFA, Cain, and the Co-Conspirator Board Members were aware of the contractual relationships between Plaintiffs and their suppliers.

218.     Notwithstanding those relationships, SEFA, Cain, and the Co-Conspirator Board Members informed Plaintiffs' suppliers that they were terminated from SEFA and made disparaging statements about Plaintiffs.

219.     On information and belief, SEFA, Cain, and the Co-Conspirator Board Members directed suppliers not to offer to Plaintiffs pricing and rebates comparable to what SEFA had negotiated, thereby preventing Plaintiffs from obtaining the benefit of the existing contracts they had with those entities.

220.     The Defendants' intentionally and unjustifiably induced those suppliers to breach their contracts with Plaintiffs by strongarming them with the collective market share of SEFA, Cain, and the Co-Conspirator Board Members.

221.     SEFA, Cain, and the Co-Conspirator Board Members are liable for tortious interference with the contracts of Plaintiffs in that they acted solely for their own interests.

222.     In committing the acts described herein, SEFA, Cain, and the Co-Conspirator Board Members acted maliciously, intentionally, fraudulently and/or recklessly. Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be determined by the Court.

223.     As a result of the Defendants' actions, Plaintiffs have been harmed in an amount to be proven at trial.

### COUNT VII
### Tortious Interference with Business Relations
### (Against SEFA, Cain, and the Co-Conspirator Board Members)

224.     Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

225.     Plaintiffs had both existing and prospective business relations with customers.

226. Plaintiffs reasonably expected to enter into valid business relationships with suppliers and with other companies that were interested in merging with or being purchased by Plaintiffs.

227. After termination from SEFA, Plaintiffs also reasonably expected to join a new buying group.

228. SEFA, Cain, and the Co-Conspirator Board Members were aware of Plaintiffs' expectancy of those relationships as to customers, suppliers, potential mergers and acquisition opportunities, and other buying groups.

229. SEFA, Cain, and the Co-Conspirator Board Members purposefully or intentionally interfered with Plaintiffs in a way that prevented the plaintiffs' legitimate expectancy from ripening into valid business relationships.

230. Specifically, SEFA, Cain, and the Co-Conspirator Board Members intentionally interfered with the business relations of Plaintiffs by inducing one or more third-parties not to enter into or continue a business relation with Plaintiffs.

231. SEFA, Cain, and the Co-Conspirator Board Members also prevented third-parties from continuing a business relation with Plaintiffs.

232. SEFA, Cain, and the Co-Conspirator Board Members intended for the immediate, embarrassing, and harmful termination of Plaintiffs from SEFA to influence others to avoid entering into contracts or business relations with Plaintiffs.

233. SEFA, Cain, and the Co-Conspirator Board Members acted with malice for the purpose of invading the contractual rights or business relations of Plaintiffs.

234. SEFA, Cain, and the Co-Conspirator Board Members are liable for tortious interference with the business relations of Plaintiffs.

235.    In committing the acts described herein, SEFA, Cain, and the Co-Conspirator Board Members acted maliciously, intentionally, fraudulently and/or recklessly.  Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be determined by the Court.

236.    As a result of the Defendants' actions, Plaintiffs have been harmed in an amount to be proven at trial.

**COUNT VIII**
**Disparagement**
**(Against SEFA, Cain, and the Co-Conspirator Board Members)**

237.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

238.    On information and belief, SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members made disparaging statements about Plaintiffs' services and business conduct, including at the Conference.

239.    The disparaging statements made by SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members were untrue or misleading.

240.    Specifically, SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members falsely claimed that Plaintiffs had violated SEFA's policies or bylaws and that it had committed wrongful acts that justified its immediate expulsion.

241.    The disparaging statements made by SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members were intended to influence the public—including customers, suppliers, potential mergers and acquisition counterparties, and other buying groups—not to buy products or services from Plaintiffs or otherwise collaborate with Plaintiffs on any business ventures.

242.    In committing the acts described herein, SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members acted maliciously, intentionally, fraudulently and/or recklessly.

Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be determined by the Court.

243.    As a result of the Defendants' actions, Plaintiffs have been harmed in an amount to be proven at trial.

## COUNT IX
### Civil Conspiracy
### (Against SEFA, Cain, and the Co-Conspirator Board Members)

244.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

245.    SEFA, Cain, Israel, Arguello and the Co-Conspirator Board Members conspired to commit the tortious acts and violations of antitrust laws alleged herein.

246.    In committing the acts described herein, SEFA, Cain, and the Co-Conspirator Board Members acted maliciously, intentionally, fraudulently and/or recklessly. Accordingly, Plaintiffs also seek an award of punitive damages in an amount to be determined by the Court.

247.    As a result of the Defendants' actions, Plaintiffs have been harmed in an amount to be proven at trial.

## COUNT X
### Breach of Contract – Policies and Procedures
### (Against SEFA)

248.    Plaintiffs repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

249.    The Policies and Procedures is a valid and enforceable contract.

250.    Paragraph 26 of the Policies and Procedures requires that, if SEFA determines a dealer member has committed a violation, SEFA will provide that member written notice providing the factual basis for its determination and give the member at least ten (10) business days to respond to the alleged violation before any penalty is applied.

251. SEFA breached the Policies and Procedures by failing to provide Plaintiffs with notice of any alleged violation or an opportunity to respond to the allegations before the extreme penalty of termination was applied.

252. SEFA breached the Policies and Procedures by voting to terminate Plaintiffs' membership effective immediately on April 27, 2024, before notifying Plaintiffs of any dispute.

253. SEFA breached the Policies and Procedures by failing to retain Plaintiffs as a member of SEFA before and after notifying Plaintiffs of their alleged violation, and then compounded that harm by failing to readmit Plaintiffs pending their response to the May 1 and May 6 Letters.

254. SEFA's breaches were material and, as a result, Plaintiffs have been harmed in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that a jury be empaneled and that a judgment be awarded in its favor and against Defendants including:

a. Compensatory damages in an amount to be determined at a trial;

b. Punitive damages in an amount to be determined at a trial;

c. Treble money damages in an amount to be determined at a trial;

d. Prejudgment interest at the maximum rate permitted by law;

e. Plaintiffs' costs and expenses in securing its rights, including an award of reasonable attorneys' fees to the extent permitted by applicable law; and

f. Such other relief as may be just and proper.

Respectfully submitted,


*/s/ Scott Gilbert*
Scott Gilbert (Illinois Bar No. 6282951)
POLSINELLI PC
150 N. Riverside Plaza, Suite 3000
Chicago IL 60606
(312) 463-6375
sgilbert@polsinelli.com

and

Joseph Hubbard (*pro hac vice* to be filed)
Keelin Kraemer (*pro hac vice* to be filed)
POLSINELLI PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
(615) 252-3940
joseph.hubbard@polsinelli.com
kkraemer@polsinelli.com

*Counsel for Plaintiffs*